UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JLM FINANCIAL INVESTMENTS 4, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Joan B. Gottschall |
| STELIOS AKTIPIS, | ) ) ) | Case No. 11 C 2561 |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff JLM Financial Investments 4, LLC ("JLM") filed a complaint for breach of contract against Defendant Stelios Aktipis. JLM alleges that Aktipis was guarantor of a loan made to Inland Springhill Fashion Center, LLC ("Springhill") for property in Kane County, Illinois; that JLM was assigned the loan agreement and related documents; that Springhill's successor-in-interest failed to make required payments due under the loan documents; and that Aktipis, as guarantor, is liable for all amounts now due under the loan. Now before the court are Aktipis's motion for summary judgment and JLM's motion for partial summary judgment as to liability, both pursuant to Federal Rule of Civil Procedure 56. The court concludes that Aktipis is not liable as guarantor for the entire amount of the debt. Aktipis's motion for summary judgment is therefore granted, and JLM's motion is denied.

### I. FACTS

The following facts are undisputed for purposes of the motions for summary judgment, except as otherwise noted. JLM is a Texas limited liability company. Aktipis is an individual residing in Illinois. The parties agree that jurisdiction is proper in this court under 28 U.S.C.

§ 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

## The Loan and Guaranty

On October 25, 2004, LaSalle Bank National Association ("LaSalle") made a loan to Springhill in the original principal amount of $7,900,000.00, as evidenced by a loan agreement and a promissory note executed by Springhill in favor of LaSalle. The loan was collateralized by a shopping center located in West Dundee, Illinois ("the Property"), pursuant to a mortgage, security agreement, fixture filing, and assignment of leases and rents.

Section 9.4 of the loan agreement described the circumstances under which the borrower could be held personally liable for a money judgment. It first explains that the loan is a non-recourse loan (i.e, a loan secured only by the Property):

> Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents following an Event of Default, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents following an Event of Default and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or other Loan Documents.

(Def.'s Statement of Facts ("SOF") Ex. 4 (Loan Agreement) 69-70, ECF No. 76-4.) The loan agreement, however, includes certain provisions under which Springhill would become personally liable for part or all of the debt:

> The provisions of this section shall not, however, . . . (g) constitute a waiver of the right to Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by the Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:
>
> . . .
>
> (vii) Failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property; or
>
> . . .
>
> Notwithstanding anything to the contrary in this Agreement, the Note, the Indemnity Agreement or any of the Loan Documents, (A) the Debt shall be fully recourse to the Borrower . . . in the event that . . . (III) Borrower fails to obtain Lender's prior written consent (to the extent such consent is required) to any subordinate financing or other voluntary lien encumbering the Property . . .

(*Id.* at 70-71.) The language of this section of the loan agreement is expressly incorporated into both the note and the mortgage.

The mortgage includes several provisions limiting permissible encumbrances to the Property: It states, in relevant part:

> 3.6 <u>Payment for Labor and Materials</u>. (a) Subject to the terms, provisions and conditions of the Loan Agreement, Borrower will promptly pay or cause to be paid when due all bills and costs for labor, materials, and specifically fabricated materials ("Labor and Material Costs") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any other party thereof any other or additional lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.
>
> . . .

3

> 6.2 <u>No Sale/Encumbrance</u>. . . . Borrower agrees that Borrower shall not, without the prior written consent of Lender, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Property or any part thereof, including but not limited to, a grant of an easement, restriction, covenant, reservation or right of way . . . or permit the Property or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred, unless Lender shall consent thereto.

(Def.'s SOF) Ex. 5 (Mortgage) 8, 12, ECF No. 76-5.) Under the loan agreement, "Permitted Encumbrances" are defined as:

> (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's reasonable discretion . . . .

(Loan Agreement 8.)

On November 10, 2004, LaSalle assigned the note, loan agreement, mortgage, and related documents to Wells Fargo Bank, N.A., as Trustee ("Wells Fargo"). On or about May 11, 2007, Springhill assigned its obligations under the loan documents to Springhill Gateway, LLC. ("Springhill Gateway"). Springhill Gateway acknowledged that the principal balance of the note as of the date of assumption was $7,900,000.00.

In connection with Springhill Gateway's assumption of the loan, Aktipis executed a guaranty, pursuant to which he agreed to guarantee payment of certain "Guaranteed Recourse Obligations of Borrower," for the benefit of Wells Fargo and its successors and assigns (the "Guaranty"). The Guaranty defines "Guaranteed Recourse Obligations of Borrower" as:

> all obligations and liabilities of Borrower set forth in subparagraphs (a) and (b) below for which Borrower shall be personally liable pursuant to and as may be defined in any of the Note, the Security Instrument, or the Other Security Documents:

4

>   . . .
>
>   (b)   The entire Debt in the event of Borrower's default under the provisions of the Note, Security Instrument, or other Security Documents relating to . . .
>
>   (ii) a prohibition of sale, transfer, or encumbrance of the Property without Lender's consent . . .

(Def.'s SOF Ex. 2 (Guaranty) 8, 12, ECF No. 76-2.) The Guaranty was drafted by an attorney who represented Wells Fargo.

### The Mechanic's Liens

Between 2009 and 2010, contractors working at the Property sought to enforce the following three purported liens against the Property (the "Mechanic's Liens"):

- On May 26, 2009, the Sure-Light Sign Company recorded a mechanic's lien against the Property in the amount of $38,114.20 (the "Sure-Light Lien");

- On September 11, 2009, the William A. Duguid Company ("Duguid") recorded a mechanic's lien against the Property in the amount of $218,408.00 (the "Duguid Lien");

- On January 15, 2010, the Robert L. Hummel Construction Company recorded a mechanic's lien against the Property in the amount of $9,700 (the "Hummel Lien").

Springhill Gateway did not consent to the recording of the Mechanic's Liens against the Property. They arose as a result of actions taken by Springhill Gateway's creditors. The Mechanic's Liens are not disclosed in the title insurance policy referenced in the loan agreement. Nor do they fall into the categories of Permitted Encumbrances listed in the loan agreement. The Mechanics Liens were not approved in writing or consented to by JLM or Wells Fargo.[1]

---

[1]   Aktipis disputes this fact. In support of the fact, JLM cites a statement in the affidavit of JLM member Jimmy Nassour that JLM did not approve the filing of the liens in writing, nor does it have records of any written approval of the liens by Wells Fargo. (Pl.'s SOF Ex. 1 (Nassour Aff.) ¶ 12, ECF No. 79-1.) Aktipis attempts to challenge the fact by pointing to a notice of default sent to Springhill Gateway by Wells Fargo and a written demand for payment sent to Aktipis by JLM. These documents, however, do not demonstrate a dispute as to whether JLM approved the liens in writing. The notice of default does not mention the Mechanic's Liens; it

Once the liens arose, Springhill Gateway took steps to contest them. The mortgage states that the borrower can in certain situations contest liens filed against the Property:

> Subject to the terms, provisions and conditions of the Loan Agreement, after prior written notice to Lender, Borrower . . . may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Mortgage or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

(Mortgage § 3.6(b).)

JLM contends that Springhill Gateway did not provide written notice of its intent to contest any of the Mechanic's Liens, as required by the mortgage. In support, JLM cites a statement to that effect in JLM member Jimmy Nassour's affidavit. (Nassour Aff. ¶ 14.) Aktipis disputes this fact, citing the affidavit of G. Ryan Liska, which states that Duguid "caused its

---

states only that the "Events of Default" included Springhill Gateway's failure to make monthly payments due under the loan documents. (Def.'s SOF Ex. 11 (May 29, 2010 Notice of Default).) The written demand states only that Springhill Gateway "has allowed mechanics liens to encumber the property." (Def.'s SOF Ex. 14 (Apr. 8, 2011 Demand Letter).) In the absence of any record evidence demonstrating a genuine dispute, the fact is deemed admitted.

6

notice of claim of mechanic's lien to be served on all interested parties, including Wells Fargo." (Def.'s SOF Ex. 7 (Liska Aff.), ECF No. 76-7.)

The parties agree that, on or about July 30, 2009, Wells Fargo received written notice of the Duguid Lien. On October 9, 2009, Duguid filed suit in Kane County, Illinois to foreclose the Duguid Lien (the "Duguid Action"). Both Springhill Gateway and Wells Fargo were named as defendants in the Duguid Action. On December 24, 2009, Duguid filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Proceeding"). On February 26, 2010, Duguid filed an adversary action in connection with its bankruptcy (the "Adversary Action"), in which it sought to foreclose the Duguid Lien against the Property. Both Springhill Gateway and Wells Fargo were named as defendants in the Adversary Action, and both appeared in the action and contested the validity of the Duguid Lien.

On November 18, 2010, the Bankruptcy Proceeding was dismissed after Duguid failed to file operating reports and pay fees. The Adversary Action was remanded to the Sixteenth Judicial Circuit Court of Kane County, Illinois. Duguid renewed its efforts to foreclose the Duguid Lien, and Springhill Gateway continued to contest those efforts. JLM entered into a settlement agreement with Duguid to resolve the Duguid Lien, pursuant to which it made a payment to Duguid in exchange for the release of the lien. In doing so, JLM acted without the consent or knowledge of either Springhill Gateway or Aktipis.

### The Mortgage Foreclosure Case

An "Event of Default" occurs under the loan documents "if any payment required . . . is not paid on or prior to the date when due." Section 7.1(a) of the mortgage states that upon an Event of Default, the lender may "declare the entire unpaid debt to be immediately due and payable." In April 2010, Springhill Gateway ceased making required monthly payments due

7

under the loan documents. On May 28, 2010, Wells Fargo sent Springhill Gateway a notice of default, acceleration, and demand for payment. The notice of default did not allege that the existence of the Mechanic's Liens constituted a default under the loan documents.

On August 19, 2010, Wells Fargo initiated foreclosure proceedings with respect to the Property by filing a verified complaint for mortgage foreclosure and other relief in the Sixteenth Judicial Circuit Court of Kane County, Illinois (the "Foreclosure Action"). Wells Fargo declared that the loan had been accelerated pursuant to Section 7.1(a) of the mortgage. Wells Fargo assigned the loan documents to JLM pursuant to an allonge and agreements dated December 14, 2010. JLM was granted leave to substitute in as Plaintiff in the Foreclosure Action. On June 11, 2011, JLM filed an amended complaint naming Aktipis as a defendant in the Foreclosure Action.

Springfield Gateway challenged the Mechanic's Liens in the Foreclosure Action. On March 14, 2011, the court in the Foreclosure Action declared the Sure-Light Lien and the Hummel Lien to be null and void.

On August 27, 2012, an order confirming sale was entered in the Foreclosure Action. The court awarded JLM a judgment *in rem* against Springhill Gateway in the amount of $10,537,358.38. The court indicated that the judgment "stands satisfied as to $1,431,416."

**The Guaranty Action**

On April 8, 2011, JLM sent Aktipis a written demand for payment of amounts allegedly due and owing under the Guaranty. In its correspondence, JLM asserted that the recording of the Mechanic's Liens against the Property had triggered the full recourse provisions of the loan documents and the Guaranty. This was the first time that either JLM or Wells Fargo had claimed that the Mechanic's Liens against the Property caused Springhill Gateway or Aktipis to become personally liable under the loan documents. JLM has received no payment from Aktipis. On

8

April 15, 2011, JLM initiated this action by filing a one-count complaint for breach of the Guaranty. The complaint alleges that Atkipis breached the Guaranty for failing to pay the entire balance currently due on the loan, totaling $9,114,546.00 as of March 31, 2011.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is called for when the nonmoving party is unable to establish the existence of an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Summary judgment may be rendered on liability alone, even if there is a genuine issue as to the amount of damages. *See, e.g.*, *Wisc. Alumni Research Found. v. Xexon Pharm., Inc.*, 591 F.3d 876, 885 (7th Cir. 2010).

## III. ANALYSIS

Most of the facts in this case are not in dispute. The parties agree that JLM's predecessor-in-interest loaned money to Springhill, and that when Springhill Gateway obtained the rights and obligations of the original borrower, Aktipis served as guarantor on the loan. They agree that the Guaranty is a valid and enforceable contract governed by Illinois law. They agree that the loan was a nonrecourse loan, and that the loan documents generally precluded the original lender or its successors in interest (henceforth referred to collectively as "JLM") from

9

seeking any personal deficiency judgment against Springhill Gateway.[2]  Under certain circumstances, however, Springhill Gateway, and Aktipis as guarantor, could become liable for the full amount of the debt.

The parties dispute whether the circumstances here triggered the recourse provisions of the loan documents, and thus whether Aktipis breached the Guaranty by failing to satisfy the debt.  Under Illinois law, "[t]he elements of a breach of contract claim under Illinois law are:  (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *Am. Safety Cas. Ins. Co. v. City of Waukegan*, 776 F. Supp. 2d 670, 707 (N.D. Ill. 2011) (citing *Roberts v. Adkins*, 921 N.E.2d 802, 811 (Ill. App. Ct. 2010)).  Only the third element of a breach of contract claim is at issue here.

Aktipis argues that he is entitled to summary judgment on JLM's complaint for three reasons:  1) Springhill Gateway's personal liability was extinguished by the judgment entered in favor of JLM in the Foreclosure Action, absolving Aktipis from his own obligations as guarantor; 2) the Mechanic's Liens recorded against the Property did not trigger a full recourse event under the loan documents and Guaranty; and 3) JLM's construction of the documents at issue would produce an absurd result contradictory to Illinois law.  JLM, in turn, argues that it is entitled to summary judgment as to liability because Springhill Gateway allowed encumbrances to be placed on the Property, triggering Aktipis's liability as guarantor for the entire amount of the debt.  The court addresses these arguments in turn.

---

[2]  "By definition, a loan is 'nonrecourse' where the debtor is not personally liable for the debt upon default, but rather, the creditor's recourse is solely to repossess the property granted as security for the loan." *Heller Fin., Inc. v. Lee*, No. 01 C 6798, 2002 WL 1888591, at *4 (N.D. Ill. Aug. 16, 2002) (internal quotation marks omitted).  In contrast, a recourse debt may be satisfied by pursuing the debtor's other assets in addition to the collateral securing the note. BLACK'S LAW DICTIONARY 1086 (West 1999).

### A. The Judgment in the Foreclosure Action

Aktipis first argues that Springhill Gateway is not personally liable for any deficiency because it was discharged from personal liability by the judgment entered in favor of JLM in the Foreclosure Action. According to Aktipis, when a judgment *in rem* was entered in favor of JLM in the Foreclosure Action, the loan itself was extinguished. Aktipis argues that the liability of a guarantor can be no greater than that of the debtor, and that if no recovery can be had against the debtor, the guarantor is absolved of liability as well.

The court disagrees. Generally, Illinois courts have held that a mortgage foreclosure action adjudicates only the interests in the property subject to the mortgage, and that a remedy pursued under a guaranty can proceed independently from the foreclosure action. *See, e.g.*, *LP XXVI, LLC v. Goldstein*, 811 N.E.2d 286, 289 (Ill. App. Ct. 2004) ("Here, foreclosure on the mortgage was chosen as the first action; thereafter, plaintiff was entitled to proceed upon the guaranty."). The Seventh Circuit has also indicated that, under Illinois law, a lender may sue a guarantor to collect a deficiency judgment after a foreclosure proceeding. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 596 F.3d 667, 671 (7th Cir. 2009).

Aktipis cites *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957 (Ill. App. Ct. 2011), and *Northbrook PLIC, LLC v. CVS Pharmacy, Inc.*, No. 10 C 0873, 2012 WL 581223 (N.D. Ill. Feb. 17, 2012), in support of his argument that when a borrower's obligations are extinguished, the guarantor's obligations are extinguished as well. But those cases involved specific circumstances absolving the guarantor that are not found here. In *Riley*, the borrower's obligations under the note had been completely satisfied, "meaning that the liability clause [did] not impose any liability on [the] defendant as guarantor." 946 N.E.2d at 965. In *Northbrook*, a

lease was terminated and supplanted by an entirely new lease; the termination ended the guarantor's liability under the original lease. 2012 WL 581223, at *6.

Here, nothing in the state court order or the loan documents absolves Aktipis of liability for a deficiency judgment. The August 27, 2012, order of the Kane County court stated that the total judgment was $10,537,358.38, and that it "stands satisfied as to $1,431,416." (Def.'s SOF Ex. 13 (Order), ECF No. 76-9.) The order was silent as to JLM's ability to recover the remainder of the judgment from the guarantor. The loan documents also explicitly indicate that JLM may seek recovery from the guarantor for a deficiency judgment. The mortgage states that "in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against . . . any guarantor . . . with respect to the Loan." (Mortgage § 7.10.) The Guaranty provides that "the obligation of the Guarantor . . . shall in no way be terminated, affected, or impaired . . . by reason of the release or exchange of any property covered by the Security Instrument or other collateral for the indebtedness evidenced by the Note." (Guaranty 3.) Based on the broad language of these documents, the court concludes that Aktipis was not absolved of liability by the judgment *in rem* entered in favor of JLM in the Foreclosure Action.

## B. The Mechanic's Liens

Aktipis next argues that the Mechanic's Liens did not trigger full recourse liability under the loan documents. Rather, Springhill Gateway's liability—and thus his own as guarantor—is limited to the actual damages sustained by JLM as a result of the liens. In support of this argument, Aktipis first points to § 9.4 of the loan agreement, which states that the lender may

> enforce the liability and obligation of Borrower, by money judgment or otherwise, *to the extent of* any loss, damage, cost, expense, liability, claim or other obligation incurred by the Lender (including attorneys' fees and costs reasonably incurred)

arising out of or in connection with . . . (vii) Failure to pay charges for labor or materials or other charges that can create liens on any portion of the Property.

(Loan Agreement § 9.4 (emphasis added).) The loan agreement then states that "the Debt shall be *fully recourse* to the Borrower . . . in the event that . . . (III) Borrower fails to obtain Lender's prior written consent (to the extent such consent is required) to any subordinate financing or other voluntary lien encumbering the Property." (*Id.* (emphasis added).)

According to Aktipis, § 9.4 of the loan agreement contemplates different bases for holding the borrower personally liable for either actual damages incurred by the lender or the full amount of the debt. Pursuant to § 9.4(vii), the filing of the Mechanic's Liens triggered liability on the part of Springhill Gateway only for the actual damages sustained by JLM as a result of Springhill Gateway's failure to pay for materials resulting in a lien on the Property. Under § 9.4(III), the full recourse trigger creating personal liability for the entire amount of the debt only occurs when a "voluntary lien" is allowed to encumber the property without the lender's consent. Aktipis argues that the Mechanic's Liens were not "voluntary liens," because Springhill Gateway never agreed to the liens. In other words, they were not created voluntarily by Springhill Gateway in order to secure an extension of credit, but rather arose involuntarily by operation of law. Thus, under § 9.4(vii), Springhill Gateway could be held personally liable only for actual damages resulting from the Mechanic's Liens, not for the entirety of the debt.

According to Aktipis, he can be held liable as guarantor only to the extent that Springhill Gateway could be held personally liable, because the Guaranty explicitly incorporates the scope of Springhill Gateway's personal liability, as set out in the loan documents. He points out that the Guaranty defines "Guaranteed Recourse Obligations of Borrower" as "all obligations and liabilities of Borrower set forth in subparagraphs (a) and (b) below for which Borrower shall be

13

personally liable pursuant to and as may be defined in any of the Note, the Security Instrument, or the Other Security Documents." (Guaranty 8.) He argues that because Springhill Gateway was not liable for the entirety of the debt under § 9.4(vii), but only for actual damages resulting from the Mechanic's Liens, JLM cannot recover the entire amount of the debt from him under the Guaranty. Rather, his liability is likewise limited to the actual damages sustained by JLM.

In response, JLM argues that the Guaranty states that Aktipis would be liable for:

(b)  The entire Debt in the event of Borrower's default under the provisions of the Note, Security Instrument, or other Security Documents relating to . . .

(ii) a prohibition of sale, transfer, or encumbrance of the Property without Lender's consent . . .

(Guaranty 12.) JLM argues that Aktipis is obligated under the Guaranty to satisfy the debt because three Mechanic's Liens were filed against the property. JLM contends that the Mechanic's Liens were not "Permitted Encumbrances," that they were not filed with prior consent from the lender, and that Springhill Gateway failed to provide notice to JLM of its intent to contest the liens or their underlying costs. According to JLM, Atkipis is liable for the entire debt under subpart (b)(ii) of the Guaranty because Springhill Gateway defaulted under the note and allowed the Property to be encumbered without JLM's consent. JLM further argues that Aktipis's liability under the Guaranty is not limited to Springhill Gateway's liability under the loan agreement, and that even if JLM could only recover actual damages resulting from the liens from Springhill Gateway, it can collect the entire amount of the debt from Aktipis.

In interpreting the Guaranty, the court applies general rules of contract construction. "Where the language of a contract is unequivocal, it must be carried out according to its language." *McLean Cnty. Bank v. Brokaw*, 519 N.E.2d 453, 456 (Ill. 1988). To the extent that there is any ambiguity in the language of the Guaranty, however, it must be construed in the

14

guarantor's favor. *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957, 965 (Ill. App. Ct. 2011) ("[O]ur analysis must be guided by the well-established principle that a guarantor 'is a favorite of the law.'"). In *Northbrook*, this court noted "Illinois law's special solicitude to guarantors, which requires that this court accord [guarantors] the benefit of the doubt when interpreting guaranty contracts." 2012 WL 581223, at *6 (internal quotation marks omitted).

The court first examines the language of the Guaranty. Although JLM quotes part of the Guaranty, which states that Aktipis would be liable for "[t]he entire Debt" in the event of a default by the borrower, it omits the immediately preceding language which states that Aktipis guarantees to the lender the "Guaranteed Recourse Obligations of Borrower," defined as "all obligations and liabilities of Borrower . . . for which Borrower shall be *personally liable* pursuant to and as may be defined in any of the Note, the Security Instrument, or the Other Security Documents." (Guaranty 2 (emphasis added).) Keeping in mind the rule that the guarantor must be accorded the benefit of any ambiguity in the language of a guaranty, the court concludes that this language indicates that Aktipis could not become liable as guarantor for the entire debt unless Springhill Gateway was personally liable for the entire debt under the loan documents.

To determine whether an event triggering Springhill Gateway's personal liability for the full amount of the debt occurred, the court next examines the loan documents. The court agrees with Aktipis that under § 9.4(III) of the loan agreement, the full recourse trigger occurs only when a "voluntary lien" is allowed to encumber the property without the lender's consent. In *In re Barnes*, 276 F.3d 927, 929 (7th Cir. 2002), the Seventh Circuit explained the difference between voluntary and involuntary liens:

> [T]here is a difference well recognized in bankruptcy and secured-transactions law between a voluntary and an involuntary lien. The former, sometimes called a consensual lien or a security interest, is the type of lien that you give someone to

15

> secure his extension of credit to you; the latter, sometimes called a nonconsensual lien . . . , arises from your having defaulted on an obligation to the tax authorities, employees, or other involuntary creditors.

*Id.* In this case, the Mechanic's Liens were involuntary liens that arose when Springhill Gateway failed to make payments for construction work. The full recourse trigger set out in § 9.4(III) is therefore inapplicable. Under § 9.4(vii), the filing of the Mechanic's Liens triggered only liability for the actual damages sustained by JLM, not liability for the entire amount of the debt.

Having so concluded, the court holds that Aktipis did not breach the Guaranty, because he is not liable for the full amount of the loan, but only for any actual damages for which Springhill Gateway could be personally liable under § 9.4(vii) of the loan agreement. This conclusion resolves the issues contested by the parties. The court need not address Aktipis's final argument—that because the loan documents permitted Springhill Gateway to contest liens filed against the Property, the mere filing of a lien could not trigger full recourse liability.

## IV. CONCLUSION

Because Aktipis is not liable as guarantor for all amounts due under the loan, he is entitled to summary judgment as to Count I of the complaint. Accordingly, the court grants his motion for summary judgment and denies JLM's motion for partial summary judgment as to liability. The clerk is directed to enter judgment in favor of Aktipis and to close this case.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 3, 2013